# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 2, 2008

## STATE OF TENNESSEE v. MARK ANTHONY BUNTLEY

**Direct Appeal from the Circuit Court for Bedford County**
**No. 16182     Lee Russell, Judge**

---

**No. M2008-01538-CCA-R3-CD - Filed April 3, 2009**

---

The defendant, Mark Anthony Buntley, was convicted by a jury of bribing a witness, a Class C felony. For his conviction, the defendant was sentenced to nine years in the Tennessee Department of Correction. On appeal, the defendant raises the following issues: (1) whether the evidence was sufficient to sustain his conviction; and (2) whether the trial court imposed an excessive sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Andrew Jackson Dearing, Shelbyville, Tennessee, for the appellant, Mark Anthony Buntley.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Charles Crawford, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant was convicted of bribing a witness and sentenced as a Range II offender to serve a nine year sentence in the Tennessee Department of Correction. The following relevant testimony was presented at the defendant's trial. Detective Brian Crews of the Shelbyville Police Department testified that in 2006, the defendant was charged with aggravated burglary and theft, and that his trial was set for January 9, 2007. Detective Crews stated that Amy Merlo, and her nine or ten year old son, Skyler Harrell, were scheduled to testify at the defendant's trial. Ms. Merlo was the defendant's former girlfriend and the mother of his child. Detective Crews testified that approximately one week prior to the January 2007 trial, he and the prosecutor met with Ms. Merlo and Skyler. Detective Crews instructed Ms. Merlo to be in court on January 9, 2007 at 9:00 a.m., and to have Skyler in court by 1:00 p.m. Neither Ms. Merlo nor Skyler appeared in court on January 9, 2007. After Ms. Merlo failed to appear, Detective Crews contacted other detectives at his office and requested that they try to locate her. The detectives were not able to locate Ms. Merlo or Skyler.

When Ms. Merlo and Skyler failed to appear after the lunch break, the defendant's trial was continued to a later date. Later on January 9, 2007, Ms. Merlo was located, taken into custody, and held without bond.

Detective Crews further testified that up to, and on January 9, 2007, the defendant was an inmate in the Bedford County Jail. After Ms. Merlo and Skyler failed to appear in court to testify on January 9, 2007, Detective Crews requested Trey Arnold, a Bedford County Sheriff's Department employee, to research the computer system to determine if the defendant placed any calls in times leading up to the January 9, 2007 trial. Detective Crews confirmed that his request to Lieutenant Arnold included a target number to be researched in the computer database. The target number was the listing for Deals on Wheels, a business where James Farrar, Jr., the defendant's cousin, was employed. Deals on Wheels was owned by James Farrar, Sr., the defendant's uncle, who also owned a local bonding company. Lieutenant Arnold informed Detective Crews that he located five telephone calls made on January 8, 2007 from the Bedford County Jail to Deals on Wheels. At Detective Crews' request, Lieutenant Arnold made a compact disc containing recordings of the telephone calls. Detective Crews testified that upon listening to the telephone calls, he identified the voices of the defendant, James Farrar, Jr., and Ms. Merlo. Additionally, the three speakers identified themselves in the calls. Detective Crews confirmed that the contents of the compact disc received from Lieutenant Arnold were fair and accurate copies of the calls that the detective reviewed. Detective Crews stated that he was aware that during the investigation leading up to the January 9, 2007 trial, Ms. Merlo had placed a restriction on her telephone which blocked calls from the jail. Detective Crews testified that the defendant contacted Ms. Merlo through a three-way call, with the original call made by the defendant from the jail to Mr. Farrar at Deals on Wheels, who then contacted Ms. Merlo.

On cross-examination, Detective Crews stated that Ms. Merlo had been issued a subpoena by the state to appear in court on January 9, 2007. Detective Crews denied being contacted by telephone or receiving correspondence from Ms. Merlo on January 8 or January 9, 2007.

Lieutenant Arnold testified that his duties with the Bedford County Sheriff's Department included computer work. Lieutenant Arnold confirmed that the defendant, as an inmate in the Bedford County Jail, had access to an outgoing telephone line. Outgoing calls from the jail were billed to the recipient of the call, and a prerecorded statement notified the inmate and the recipient of each call that calls were subject to monitoring and recording. All outgoing calls were digitally stored on a computer hard drive. On January 9 or 10, 2007, Lieutenant Arnold was contacted by Detective Crews who requested that he perform a search for outgoing calls to a target number provided by Detective Crews. Lieutenant Arnold performed the search and notified Detective Crews that five calls made to the target number were located. At Detective Crews' request, Lieutenant Arnold made a disc and then compared the original recordings of the calls on the hard drive to the recordings of the calls on the compact disc and found the recordings were exactly the same. A call log showed calls from the defendant were made on January 8, 2007 at 11:55 a.m., 12:10 p.m., 2:48 p.m., 2:51 p.m. and 3:09 p.m.

The compact disc containing recordings of the five calls was made an exhibit at trial and played for the jury. The jury was also provided copies of transcripts of the recorded calls to review while listening to the recordings. The recordings revealed that on January 8, 2007, the defendant called Mr. Farrar, who identified himself as "Blue." The defendant could not directly contact Ms. Merlo from Bedford County Jail because she had placed a "block" of collect telephone calls on her residential telephone. The defendant informed Mr. Farrar that he was "nervous" about his trial and commented that he thought Ms. Merlo was "gonna be up there testifying against me." The defendant then asked Mr. Farrar for "a favor" and requested that Mr. Farrar have Ms. Merlo called "on a three-way." Mr. Farrar complied and the following conversation took place:

MR. FARRAR: Yeah, here, man. Call three-way for [the defendant], will you?
UNIDENTIFIED SPEAKER: Who do you want me to call?
[THE DEFENDANT]: Amy [Merlo]. I think she's testifying against me.
. . . .
After Ms. Merlo was contacted, the following conversation occurred:
[THE DEFENDANT]: Hey, you coming to court to testify against me tomorrow, ain't you?
MS. MERLO: Mark?
[THE DEFENDANT]: Yeah.
MS. MERLO: I'm not like trying to do all that, but I mean, but they-they come over and they like (inaudible) and I'm gonna have to do this or this is going to happen. And they talked to Skyler.
. . . .
They wanted to talk to him. I didn't really have a choice they could subpoena me anyway and there wasn't nothing I could do about it.
. . . .
MR. FARRAR: This is Blue. You ain't going up there to testify against him, are you?
. . . .
MS. MERLO: No, [I]'m not testifying against him, but my son will be.
[THE DEFENDANT]: They're gonna call you to testify tomorrow. You know that, don't you?
MS. MERLO: Yes, Mark.
MR. FARRAR: I mean, hell, Amy, you don't know nothing, though, do you?
. . . .
I mean, the boy's going to get royally f[---]ed tomorrow if somebody don't act right.
MS. MERLO: Blue, I know what the f[---]'s going on. I know what I'm doing, too.
. . . .
You act like I'm going to come up there and f[---]ing go-just like tell all this s[---], and I'm not.
. . . .

The defendant placed a second call to Mr. Farrar. Prior to Ms. Merlo joining the call, the following exchange took place between Mr. Farrar and the defendant:

MR. FARRAR: Lord, she's gonna royally screw you tomorrow.
[THE DEFENDANT]: I know it, man. It's f[---]ed up. I had a f[---]ing gut feeling she was going to do that s[---].
MR. FARRAR: Did you hear her lie first and say she wasn't?
[THE DEFENDANT]: Yeah.
. . . .

The second call continued and Ms. Merlo was contacted. A discussion with comments regarding the block on Ms. Merlo's telephone line ensued and included the following dialog:

[THE DEFENDANT]: I guess you better get on that phone and call them and tell them - -
MS. MERLO: I have been, Mark. I called them like two days ago. My bill wasn't but like $83 - -
[THE DEFENDANT]: It don't really matter, because this is the only thing I needed to talk to you about, right here and we're talking about it and then I'm f[---]ing mad, now.
MS. MERLO: Okay.
[THE DEFENDANT]: You're fixing to get up there and get me a lot of time . . . .
MS. MERLO: All right, Mark, whatever.
[THE DEFENDANT]: For real, Amy.
MS. MERLO: All right, we done talking then?
[THE DEFENDANT]: You know how much time I'm looking at right now? Seriously?
MS. MERLO: Yeah.
[THE DEFENDANT]: I'm looking at getting 8 to 12 on one charge and 3 to 6 on the other one, and I've already got four years . . . . That's a lot of time.
MS. MERLO: Well, I wasn't even going to go and they said they could get me for contempt of court.
[THE DEFENDANT]: They tell you a lot of things.
MS. MERLO: So they can't arrest me if I don't show up?
[THE DEFENDANT]: You're gonna have to show up now.
. . . .
MR. FARRAR: Well-
[THE DEFENDANT]: They can't-they can't make Skyler get on the stand.
MR. FARRAR: Mark, Mark. As far as Amy and him, they don't have to show up tomorrow. They can't get in no trouble, neither . . . .
[THE DEFENDANT]: That's what my lawyer - - my lawyer said that they don't have to show up, said Skyler don't even have to - -
MR. FARRAR: He - - he's a minor.

-4-

MS. MERLO: They said we was subpoenaed. They said that if I don't show up that they could get me for contempt.

MR. FARRAR: No, they can't.

[THE DEFENDANT]: Skyler cannot be subpoenaed - -

MR. FARRAR: They-they tell you that kind of s[---], Amy, to scare you. I ain't taking up for Mark or nothing but he needs some help.

[THE DEFENDANT]: Yeah, I need all the help I can f[---]ing get right now.

MR. FARRAR: Well, the best thing to do is not show up tomorrow.

[THE DEFENDANT]: They can't arrest you for it (inaudible).

MR. FARRAR: They can't arrest you for it.

[THE DEFENDANT]: They especially can't arrest Skyler . . . .

MR. FARRAR: They arrest you, I'll come up there and make your bond for free.

MS. MERLO: Well, you better damn it.

MR. FARRAR: You just don't go up there tomorrow.

MS. MERLO: Then I'm going to be violated.

MR. FARRAR: You call me.

. . . .

During the third call, the defendant and Mr. Farrar were not able to contact Ms. Merlo, however Mr. Farrar stated to the defendant that he would "give [Ms. Merlo and Skyler] $50 and send them to Nashville. Make sure somebody goes with them out of town." During the fourth call, Ms. Merlo was contacted and Mr. Farrar again offered "[b]ut if you go to jail, we'll make your bond. It won't cost you a nickel. But more or less they probably won't even do that. That's at the most." Also during this call, the defendant confirmed that Ms. Merlo had signed a subpoena and was legally obligated to arrive at court the following day. At one point, Mr. Farrar stated that he was putting the telephone down to allow the defendant and Ms. Merlo to talk. The defendant repeated to Ms. Merlo Mr. Farrar's statement regarding the payment of money stating "Blue said he was going to give you a hundred dollars and tell you to go to Nashville." The defendant stated that Ms. Merlo should "go up there and talk to Blue."

During the fifth call, the defendant informed Mr. Farrar that Ms. Merlo agreed to come to Deals on Wheels to see Mr. Farrar that afternoon, and that she was not going to appear in court the following day. Mr. Farrar told the defendant that they would call Ms. Merlo in the morning to "make sure she ain't coming."

The defendant declined to testify on his own behalf. Based on the evidence presented at trial, the jury found the defendant guilty of bribing a witness. The defendant was sentenced as a Range II, multiple offender to nine years to be served at 35% in the Tennessee Department of Correction.

I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence as to his conviction for bribing a witness. The defendant contends that he said nothing to Ms. Merlo to induce her to be absent from

his trial. The defendant asserts that Ms. Merlo's decision not to show up and testify was made independent of any discussion with him. The defendant asserts that on January 8, 2007, Ms. Merlo stated her intentions to be absent from the trial during the first telephone call and offers to pay her bond were made after she had "committed not to appear." The defendant argues that his conviction was erroneously based on speculative and insufficient circumstantial evidence.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id*.

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a)(2006). One is criminally responsible for an offense committed by another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." *Id*. § 39-11-402(2). Criminal responsibility is not a separate crime but "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Dickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003) (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). To be criminally responsible for the acts of another, the defendant must "in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

Relevant to this case, the offense of bribing a witness occurs when a person "[o]ffers, confers or agrees to confer anything of value upon a witness or a person the defendant believes will be called as a witness in any official proceeding with intent to . . . [i]nduce the witness to be absent from an official proceeding to which that witness has been legally summoned[.]" Tenn. Code Ann. § 39-16-107 (a)(1)(C).

The defendant argues that Ms. Merlo stated her intention not to testify in the first telephone conversation and contends that he did not offer anything of value to her to induce her not to appear. However, the evidence, viewed in the light most favorable to the state, showed that on the day before the defendant's trial, he called Mr. Farrar and stated that he was "nervous" about the trial and that he thought that Ms. Merlo was going to testify against him. The defendant then asked Mr. Farrar for "a favor" to have someone there "call Amy [Merlo] on the three-way." The defendant again repeated his concern regarding Ms. Merlo's testimony to an unidentified speaker who was asked by Mr. Farrar to "call three-way for the [defendant]" stating he wanted to call Ms. Merlo, and said he thought "she's testifying against me." Upon reaching Ms. Merlo, the defendant immediately asked her to confirm that she was "coming to court to testify against [the defendant] tomorrow . . . ." The dialog that followed reflected that Ms. Merlo believed that she had no choice in testifying at the defendant's trial. Although Ms. Merlo stated she would not be testifying against the defendant, the defendant did not believe Ms. Merlo. After the first conversation with Ms. Merlo, the defendant stated to Mr. Farrar "I knew she was f[---]ing gonna testify against me." The defendant made three more attempts to contact Ms. Merlo and spoke with her two more times. During these conversations, the defendant said "[y]ou're fixing to get up there and get me a lot of time." When Ms. Merlo indicated that she had been told she would be arrested for contempt of court if she did not show up at the trial, the defendant indicated that his "lawyer said that they don't have to show up," and that Skyler could not be subpoenaed because he was a minor. Mr. Farrar further responded to Ms. Merlo's concerns about being arrested for contempt and losing her job and offering to pay her bond "for free." On another occasion, Mr. Farrar stated, "[b]ut if you go to jail, we'll make your bond. It won't cost you a nickel." The evidence showed that Mr. Farrar, Sr., the defendant's uncle, owned a bail bonding business at the time. During the third call, Mr. Farrar told the defendant that he would give Ms. Merlo fifty dollars and send Ms. Merlo and Skyler out of town. In the fourth call, the defendant informed Ms. Merlo that Mr. Farrar said he was going to give her money and would tell her to go to Nashville. The defendant instructed Ms. Merlo "to go up there and talk to Blue." The telephone conversations establish that the defendant knew Ms. Merlo was under subpoena to testify and that he attempted to influence her to be absent from his trial.

We are not persuaded by the defendant's contention that Ms. Merlo had already decided not to appear to testify before any offers were made, and that therefore his actions did not induce Ms. Merlo not to appear as a witness at the defendant's trial. The statute for bribing a witness clearly defines the offense as offering anything of value with *intent* to induce. Tenn. Code Ann. § 39-16-107 (a)(1)(C) (emphasis added). A showing that the defendant's offers actually induced Ms. Merlo not to testify was not necessary for his conviction. The jury was also instructed on criminal responsibility for the conduct of another. In addition to the defendant's actions, Mr. Farrar made offers to Ms. Merlo in the course of telephone calls initiated by the defendant. Therefore, a rational trier of fact could find that the defendant offered something of value to Ms. Merlo, whom he knew was legally summoned, with the intent of inducing her to not testify at the trial against him. Accordingly, we conclude that the evidence at trial was sufficient to support the conviction.

II. Length of Sentence

The defendant asserts that the sentence imposed by the trial court was excessive and contrary to law. In support of his assertion, the defendant gives a general citation to Tennessee Code Annotated section 40-35-103 and "the testimony at Trial and the Sentencing Hearing."

When a defendant challenges the length and manner of service of a sentence, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then a review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentencing decision was improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. We will uphold the sentence imposed by the trial court if: (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210. If this court determines that the sentence is erroneous, it "may affirm, vacate, set aside, increase or reduce the sentence imposed or remand the case or direct the entry of an appropriate order." *Id.* § 40-35-402(c).

The mechanics of arriving at an appropriate sentence are spelled out in the Criminal Sentencing Reform Act of 1989 and its amendments. The trial court is free to select any sentence within the applicable range so long as the length of the sentence complies with the purposes and principles of the Sentencing Act. *Id.* § 40-35-210; *see also State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (noting that such principles encompass themes of punishment fitting of the crime, deterrence, and rehabilitation). However, the trial court is required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." Tenn. Code Ann. § 40-35-210(d). Once applied, the chosen enhancement factor becomes a sentencing consideration subject to review under Tennessee Code Annotated section 40-35-401(c)(2). Thus, while the court can weigh enhancement factors as it chooses, the court may only apply the factors if they are "appropriate for the offense" and "not already an essential element of the offense." *Id.* § 40-35-114.

In conducting a de novo review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

In the instant case, the defendant was convicted of bribing a witness, a Class C felony. Tenn. Code Ann. § 39-16-107(d). At the sentencing hearing, the parties stipulated that the defendant was

a Range II offender, which subjected him to a sentence of six to ten years. *Id.* at § 40-35-112(b)(3). As to enhancement factors, the trial court found that the defendant had a previous history of criminal convictions evidenced by the presentence report and additional exhibits filed by the state which provided proof of criminal convictions not included in the presentence report. The court also found that the defendant failed to comply with the conditions of a previous sentence involving release into a community based on the revocation of his probation upon a conviction of possession of a Schedule IV controlled substance. The court further noted that the defendant was incarcerated at the time of the instant offense. The court found that the defendant was the leader in the commission of the instant offense. As previously noted, this finding is supported by the evidence in the record. Finally, the trial court found that the defendant had been convicted as a juvenile of fraudulent use of a credit card in the amount of $1,000 - $10,000, which would have been a felony had the defendant been an adult at the time of the offense. The court found one mitigating factor, that the crime neither caused nor threatened serious bodily injury but did not give the factor "any significant weight."

The record supports the trial court's findings of fact, and the defendant's sentence was within the appropriate range designated by the sentencing guidelines. Therefore, we conclude that the defendant's sentence was not excessive or contrary to our sentencing laws. The defendant is without relief as to this issue.

## III. Conclusion

Based on the foregoing, we affirm the trial court's conviction and sentencing of the defendant.

_____
J.C. McLIN, JUDGE